IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |  |
|---|---|---|
| | * | |
| JAMES BLASIC, | | |
| | * | |
| Plaintiff, | | |
| | * | |
| v. | | CIVIL NO.:  WDQ-04-4022 |
| | * | |
| CHUGACH SUPPORT SERVICES, | | |
| INC., *et al.*, | * | |
| | | |
| Defendants. | * | |

*    *    *    *    *    *    *    *    *    *    *    *    *

MEMORANDUM OPINION

James Blasic sued Chugach Support Services, Inc. ("CSS")
and Chugach Alaska Corporation ("CAC") for violating 42 U.S.C. §
1981.  Pending are renewed cross motions for summary judgment
(Paper Nos. 82 & 90), Blasic's renewed motion to exclude the
Defendants' expert (Paper No. 88), and the Defendants'
supplemental motion for summary judgment on damages (Paper No.
163).  For the following reasons, the cross motions for summary
judgment will be denied; Blasic's motion to exclude and the
Defendants' supplemental motion on damages will be granted in
part and denied in part.

I.  Background

    A.   Blasic's Employment with CSS

    CAC is an Alaska Native Corporation formed under the Alaska
Native Claims Settlement Act.  Def.'s Mot. Summ. J. Ex. 1

(Barney Uhart Decl. ¶ 2, Dec. 5, 2005).[1]  CSS, a subsidiary of
CAC, did construction projects for the United States Department
of Health and Human Services ("HHS") at the National Institutes
of Health campus in Bethesda, Maryland.  *Id.* Ex. 2 (Lori Clowers
Decl. ¶ 4, December 6, 2005); Uhart Decl. ¶¶ 3-4.  Blasic was
the CSS finance manager there.  *Id.* Ex. 19 (Robert Westermann,
Jr. Dep. 10:5, Nov. 4, 2005).

On May 27, 2003, Blasic sent Peggy Brewer, the CAC
Controller, an email that accused David Hamlett, the NIH site
project manager,[2] of taking kickbacks from the carpenters' union.
*Id.* Exs. 14 & 15 (Peggy J. Brewer Dep. 67:11-13, Nov. 2, 2005).
Brewer forwarded this email to Hutton, who told Blasic that his
email had been "totally inappropriate" and instructed him to let
Hamlett make the project decisions.  *Id.* Ex. 14.  On May 29,
2003, Hamlett emailed CSS Director of Construction Services,
James Hutton, that Blasic should be replaced, but no action was
taken.  *Id.* Ex. 16.

Several months later, Hamlett reprimanded Blasic for his
"inappropriate and insubordinate" email.  *Id.* Ex. 17.[3]  On

---

[1]  43 U.S.C. § 1601 *et seq.*

[2]  Around June 2003, Hamlett became the NIH site human
resources manager.  Hamlett Dep. 59:7-60:18.

[3]  CSS employees at the NIH site were subject to a
progressive discipline policy.  McCanna Dep. 186:6-8.  Under
this policy:

September 4, 2003, Robert Westermann, the CSS President, met
with Hutton, Hamlett, and Blasic about the reprimand.
Westermann Dep. 8:11-19, 9:23.  In that meeting, Westermann tore
up the reprimand because it was untimely and admonished Blasic
and Hamlett to "work in concert" and "get along."  *Id*. 8:18-25.
Westermann intended this meeting "to clean the slate."  *Id*.
8:23.[4]

On September 20, 2003, John Weldon, the NIH site
superintendent, terminated two Hispanic painters[5] on Hamlett's
recommendation.  Def.'s Mot. Summ. J. Ex. 44.  Two Hispanic

---

CSS will apply corrective discipline in progressive steps.
With the exception of serious offenses where the company
determines that immediate dismissal is appropriate, the
progression of disciplinary action is as follows:
1. Verbal Warning
2. One written notice
3. Final notice/discharge
However, CSS reserves the right to bypass any step in this
procedure and take disciplinary action, including
terminating an employee without prior warning or notice,
where misconduct warrants immediate response. . . .

If a final notice is required and the employee is to be
discharged, the department manager *and* the Human Resources
Manager must approve the action.

Pl.'s Opp. Damages Ex. 6 at 1-2 (emphasis in original).

[4]  Westermann states that soon after this meeting Blasic
"reverted back to his sending out blanket memorandums . . .
[and] bring[ing] up inflammatory issues that continued to cause
a rift between himself and David Hamlett."  Westermann Dep.
9:21-10:4.

[5] They were former plaintiffs in this suit, Carlos Borrayo
and Mario Rodas.

carpenters employed at the NIH site had also been terminated that month.  *Id*.  On October 15, 2003, Blasic sent an email to CAC senior financial analyst Kathy Schreiber about potential lawsuits and EEOC claims against "Chugach"[6] by recently terminated Latino employees.  *Id*. Ex. 20; Uhart Decl. ¶ 5.  That email mentioned "numerous derogatory comments . . . by Chugach management about non-white workers."[7]  Def. Mot. Summ. J. Ex. 20. Schreiber forwarded this email to Brewer and Hutton.  *Id*.  This was the Defendants' first notice of possible discrimination at the NIH site, *Id*. at 10, and Hutton was directed to investigate. Hutton Dep. 47:2-6.

In the week following this email, Hutton and Blasic met to discuss these allegations.  Def.'s Reply & Opp. 24.  During one of these meetings, Hutton asked Blasic why he had sent his email to Schreiber.  James M. Blasic Dep. 233:2-7, Oct. 6, 2005 [hereinafter Blasic Dep. I].  Blasic explained that he "didn't feel comfortable going to [Hamlett] about the problem" and had been "instructed on more than one occasion that corporate

---

[6]  It is unclear whether "Chugach" meant CAC, CSS, or both.

[7]  CSS also has a policy that prohibits harassment based on race and national origin.  Def.'s Mot. Summ J. Ex 23.  Under this policy, "[a]*ny* employee who becomes aware of an incident of harassment . . . should report it to their supervisor, the Human Resources Manager or any officer of the company with whom they feel comfortable."  *Id*. (emphasis in original).  Schreiber was not Blasic's supervisor or an officer of CSS or CAC.  Uhart Decl. ¶ 5.

accounting wanted to be kept informed . . . [Schreiber] wanted to be kept in the loop about what was going on." *Id*. 233:14-22.

On October 22, 2003, Hutton met with Blasic to discuss the alleged discrimination and the investigation. Hutton Dep. 130:12-131:12; Blasic Dep. I 249:7-19. During the conversation, Blasic said Hamlett was a "racist" and "bigot" and accused him of trying to "cover up what Hamlett was doing at the site." Def.'s Mot. Summ. J. Ex. 44; Hutton Dep. 129:23-25. Hutton became upset when Blasic brought up discrimination and asked why Blasic had not kept the matter "in-house." Blasic Dep. I 250:7-10. Blasic said that Henry Brabham could confirm Hamlett's discrimination; Hutton asked Blasic to get Brabham so they could discuss the allegations and "resolve this issue once and for all." Def.'s Mot. Summ. J. Ex. 44. Brabham was not available, so Hutton postponed the meeting. *Id*. The meeting never resumed. *Id*. Hutton "decided that Blasic never would get past his personal vindictive against Hamlett[] and should be terminated for the good of the project." *Id*. Hutton fired Blasic later that day. *Id*.

Hutton said he fired Blasic for "insubordination and not being part of the team."[8] Hutton Dep. 139:13-16. According to

---

[8] Blasic's Personnel Action Notice states that he was terminated because he was "disruptive, insubordinate, not a team player." Def.'s Reply & Opp. Ex. 47. Only Hutton signed this form, and the signature lines for "recommended by," "Site Human

Hutton, "[t]here were many discussions about [Blasic's] termination through the entire project . . . because he was not a team player," "he didn't know how to follow the chain of command," and "[h]e was very disruptive with his emails."  *Id*. 139:21-24.  On October 27, 2003, Hamlett submitted a list of his reprimands of Blasic to Hutton.  Pl.'s Opp. Damages Ex. 6. Blasic had never been disciplined.  *Id*.; Hutton Dep. 91:16-23.

After his termination on October 22, 2003, Blasic began looking for another job.  Blasic Dep. I 92:12-17.  On November 14, 2003, Blasic became a senior accountant at STG, Inc.  Def.'s Supp'l Mot. Damages Ex. 2 at 2 [hereinafter Blasic Interrogs.]. His salary was $65,000, and he received three weeks vacation, two weeks sick pay, health insurance with a payroll deduction, and a 401k plan.  *Id*.  This job had "weaker" benefits,[9] required longer hours, was a "reduction in responsibilities," and involved a much longer commute;[10] but he "was forced to take [it] because [he] had bills to pay."  Blasic Dep. I 89:14-21, 92:18-22.

---

Resources," and "CSS Project Manager/Corporate Human Resources" are blank.  *Id*.

[9]  Blasic's position at STG had a less generous 401k plan, a payroll deduction for health benefits, paid leave that was not "owned" by him, and fewer vacation and sick days.  *See* Blasic Interrogs. 2; Blasic Dep. I 90:11-16.

[10]  *See* Blasic Dep. I 90:5-8.

Following Blasic's termination, CAC chief financial officer Connie Baehr visited the NIH site and reported several employees' complaints to CAC staff counsel James McCanna. Def.'s Mot. Summ. J. Ex. 33 (Connie Baehr Dep. 39:6-24, October 31, 2005). McCanna's subsequent investigation included a review of Blasic's termination. *Id.* Ex. 38 (James McCanna Decl. ¶¶ 1-2, Dec. 5, 2005). McCanna found that Hutton's prior investigation, "though well-intentioned," had been incomplete. McCanna Decl. Ex. 1 at 3. McCanna was concerned by "basic site management issues" and "inappropriate comments made by Mr. Hamlett." *Id.* In December 2003, McCanna's findings led to Hamlett's termination, Hutton's removal as supervisor at the NIH site, and Weldon's resignation. *Id.*

On December 23, 2003, Baehr told Blasic that Hamlett was no longer employed with CSS and said "[w]e still have details to work out but I was wondering if you would be interested in getting your job with Chugach back?" Def.'s Supp'l Mot. Damages Ex. 4 at 1. Blasic said he might be interested, and Baehr said she "would pass this information along" and "contact him after January 5, [2004]." *Id.*

On January 8, 2004, Baehr left a message for Blasic, offering him his former job and asking him to call her. *Id.*[11]

---

[11]   Baehr explained that Blasic was offered his job back because he was "technically competent," his "conflict seemed to

The next day, Blasic emailed Baehr, requesting "details of [her] proposal in writing" including "position, salary, damages, attorney's fees, etc." *Id*. Baehr never responded. *Id*.

On January 20, 2004, Baehr called Blasic, offering to re-hire him at his previous salary. *Id*. She asked Blasic to respond by January 31, 2004, and said the offer would be put in writing upon his acceptance. *Id*. Blasic never accepted the offer.[12] *Id*.

In June 2004, Blasic resigned from STG to become a controller at Energetics, Inc. Blasic Interrogs. 2; Blasic Dep. I 89:12-17. His salary was $68,500, and he received two weeks vacation, two weeks sick leave, and health insurance with a payroll deduction.[13] Blasic Interrogs. 2. On April 8, 2005, Blasic was terminated from Energetics. *Id*. From December 21, 2005 to March 31, 2006, Blasic worked for Spherion as an accounting temp, earning $37.50 per hour and no benefits. *Id*.

---

be with Hamlett . . . [who] was gone," and CAC was "willing to give [him] another opportunity to perform." Baehr Dep. 68:12-24. McCanna stated that this offer was made in "an effort to be fair" to Blasic. McCanna Decl. Ex. 1 at 3.

[12] On February 4, 2004, Blasic called Baehr, but her memorandum of the conversation does not mention any discussion about the job offer. Def.'s Supp'l Mot. Damages at 2. The Defendants were "not [then] aware of any damages [Blasic] had suffered" or that he planned to file an EEOC action against them. McCanna Decl. Ex. 1 at 4.

[13] At Energetics, Blasic did not get 401k matching and paid leave was not "owned" by him. Blasic Interrogs. 2.

at 3.  From October 10, 2006 to May 10, 2007, Blasic worked for EAS, LLC as an accounting temp without benefits.  *Id.*  Blasic's starting wage at EAS was $45.00 per hour, and it increased to $55.00 per hour on March 1, 2006.  *Id.*  From June 24, 2007 to February 10, 2008, Blasic worked for K-Force as an accounting temp, earning $53.00 per hour and limited benefits.[14]  *Id.*  From August 25, 2008 to March 10, 2009, Blasic worked for Adam Grayson as an accounting temp, earning $55.00 per hour and no benefits.  *Id.*

B.   Procedural History

Blasic filed a timely charge with the Equal Opportunity Employment Commission, which issued a right to sue letter.  *See* Am. Compl. ¶ 12.  On December 12, 2004, Blasic and Jose Aleman, Cesar Basilis, Borrayo, and Rodas sued CSS and CAC for violations of 42 U.S.C. § 1981[15] and Title VII of the Civil Rights Act of 1964.[16]  On November 11, 2005, the Court dismissed Aleman's and Basilis's claims. Paper No. 64.  On December 16, 2005, the Defendants filed a motion for summary judgment.  Paper No. 82.  On January 20, 2006, Blasic filed motions to exclude

---

[14] These "limited benefits" included "limited health insurance but no vacation, sick days, or holidays."  Blasic Interrogs. 3.

[15]   42 U.S.C. §1981 (2006).

[16]   42 U.S.C. §§ 2000e *et seq.* (2006).

the Defendants' expert and for partial summary judgment.   Paper

No. 88 & 90.   On March 28, 2006, the Court granted summary

judgment to the Defendants on Borrayo, Rodas, and Blasic's

claims.   Paper Nos. 103.   They appealed.   Paper No. 105.   The

Fourth Circuit reversed summary judgment against Blasic on his

§ 1981 claims.[17]   *Aleman v. Chugach Support Servs., Inc.*, 485

F.3d 206 (4th Cir. 2007).

On July 17, 2009, Blasic renewed his motions to exclude

Defendants' expert and for partial summary judgment.   Paper No.

157.   On August 13, 2009, the Defendants filed a supplemental

motion for summary judgment on damages and renewed their motion

for summary judgment.   Paper No. 163.   Following *Aleman*, the

Court will consider Blasic's claim for retaliation under §

1981.[18]

## II.  Analysis

### A.   Standard of Review

Under Rule 56(c), summary judgment "should be rendered if

the pleadings, the discovery and disclosure materials on file,

---

[17]   On February 27, 2007, Borrayo and Rodas voluntarily
dismissed their claims with prejudice.

[18]   The Defendants assert that Blasic's "state and local law
claims have no independent jurisdictional basis, and grounds for
asserting pendent jurisdiction shall have disappeared with
summary judgment on the federal law claims."   Def.'s Mot. Summ.
J. 34.   Because the parties have not addressed the merits of
these claims in their motions for summary judgment, the Court
will deny summary judgment on these claims.   *See* Am. Compl. ¶¶
27-32, 33-38, 49-53

and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in h[is] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court also "must abide by the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003). "[C]ourts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, [but] summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law."  *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996).

B.    Rule 56(e) Evidentiary Issues

The Defendants have challenged five of Blasic's exhibits. Under Fed. R. Civ. P. 56, the Court may consider evidence on summary judgment that would be admissible at trial.[19] Depositions and affidavits must be based on personal knowledge, and all documents and other physical evidence must be properly authenticated and either non-hearsay or within a recognized exception.[20]  But "uncertified or otherwise inadmissible documents may be considered by the court if not challenged." Wright, Miller, & Kane, *supra*, § 2722.  An objecting party must "spell out the nature of the defects clearly and distinctly." 11 James W. Moore, *et al.*, *Moore's Federal Practice*, § 56.14(4)(b).

"[T]he papers of a party opposing summary judgment are usually held to a less exacting standard than those of the moving party."[21]  "[T]he nonmoving party need not produce

---

[19] *See Conkwright v. Westinghouse Elec. Corp.*, 739 F. Supp. 1006, 1014 n.7 (D. Md. 1990)(*citing* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2721 (3d 1998)).

[20] *See* Fed. R. Civ. P. 56(e); *Cottom v. Town of Seven Devils*, 30 Fed. Appx. 230, 234 (4th Cir. 2002); *Orsi v. Kirwood*, 999 F.2d 86, 92 (4th Cir. 1993)("It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment.").

[21] *Salami v. North Carolina Agric. & Tech. State Univ.*, 394 F. Supp. 2d 696, 706 (M.D.N.C. 2005) (*quoting Grey v. Potter*,

evidence in a form that would be admissible at trial, but the content or substance of the evidence must be admissible." *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995)(internal citations and quotations omitted).  "[D]oubts regarding admissibility are resolved in favor of the party opposing summary judgment." *U.S. v. Bell*, 27 F. Supp. 2d 1191, 1194 (E.D. Cal. 1998).[22]

The Defendants object to "the entire EEOC file[], including but not limited to any EEOC determinations"[23] on authentication and hearsay grounds.  Pl.'s Opp. & Cross Mot. 10.  The Defendants here failed to identify the documents that lack authentication and those portions which contain hearsay.  As they have not been properly objected to, the Court will consider them.

The Defendants have also objected to hearsay statements in Baehr's November 2003 memorandum[24] and Hamlett's December 26,

---

No. 1:00CV00964, 2003 WL 1923733, at *4 (M.D.N.C. Apr. 21, 2003)).

[22]  Here, the challenged documents support Blasic's opposition to the Defendants' motion for summary judgment and his cross motion for partial summary judgment.  The "less exacting standard" only applies when these documents are used to oppose the Defendants' motion for summary judgment.

[23]  Portions of the EEOC file were attached to Blasic's motion.  *See* Pl.'s Opp. & Cross Mot. Ex. 2 & 3.

[24]  Def.'s Mot. Summ J. Ex. 34

2003 email.[25]  *Id*. at 11.   The Court will not consider

inadmissible hearsay in Baehr's memorandum.  Hamlett's email is

admissible under Fed. R. Evid. 803(3) as evidence of his post-

termination state of mind.

The Defendants also objected to the Pre-Employment

Reference Check Form,[26] containing statements allegedly made by

Hamlett during an interview, and a Conflict Resolution Action

Form,[27] prepared by Blasic.  These unauthenticated forms contain

inadmissible hearsay and will not be considered.

C.   Blasic's Renewed Motion in Limine to Exclude
     Defendant's Expert Report

The Defendants support their motions with a report by Mark

Kost, a consultant with Capital Construction Consultants, Inc.

*See* Def.'s Mot. Summ. J. Ex. 26.  Kost is an expert in

construction costs but has no specialized training in personnel

or equal employment opportunity.  Pl.'s Mot. Limine Ex. 2 (Mark

K. Kost Dep. 6:22-7:1, 8:13-20, Nov. 17, 2005).  Blasic seeks to

exclude Kost's opinions about Blasic's termination, the state of

the Washington, D.C. area construction market in the fall of

2003, and the availability of work for construction accounting

personnel then.  *Id*. at 2.  Blasic argues that Kost's report and

---

[25]  Pl.'s Opp. & Cross Mot. Ex. 2 at 1358-59.

[26]  Def.'s Mot. Summ. J. Ex. 42.

[27]  Pl.'s Reply & Opp. Ex. 4.

testimony are not reliable because he (1) is not qualified to
testify about personnel matters, (2) has no labor market
background, (3) relied on insufficient and unreliable data, and
(4) will not assist the jury. *Id.* at 2-3.  The Defendants
contend that these arguments go to the weight--not admissibi-
lity--of Kost's testimony. Def.'s Opp. Limine 3, 12.

> When:
>
> [S]cientific, technical, or other specialized knowledge
> will assist the trier of fact to understand the evidence or
> to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion or
> otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

Fed. R. Ev. 702.  Expert testimony must be reliable and
relevant. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152
(1999).  An expert opinion is relevant "only to the extent the
expert draws on some special skill, knowledge, or experience to
formulate that opinion; the opinion must be . . . informed by
the witness' expertise[] rather than simply an opinion broached
by a purported expert." *Shreve v. Sears, Roebuck & Co.*, 166 F.
Supp. 2d 378, 393 (D. Md. 2001) (internal quotations and
citations omitted).  When a party seeks to admit expert
testimony, the district court acts as "gatekeeper" to "make
certain that an expert, whether basing testimony upon
professional studies or personal experience, employs in the

15

courtroom the same level of intellectual rigor that
characterizes the practice of an expert in the relevant field."
*Id*.

The Defendants have not shown that Kost has expertise in
human resources or the availability of work for construction
accounting personnel.  Thus, the Court will not consider Kost's
opinions about Blasic's termination or the availability of jobs
for him.  Kost is qualified to testify about the construction
market in the Washington, D.C. area in the fall of 2003 because
of his experience in that area then.  *See* Def.'s Opp. Limine 6,
Ex. 1.

    D.   The Defendants' Renewed Motion for Summary Judgment

        1.   General Mandate Rule

Blasic contends that the Defendants have "waived the non-
immunity legal arguments in their motion by failing to rely upon
them in the Fourth Circuit."  Paper No. 159 at 1.  He argues
that the Circuit "fully and finally disposed of the issues
raised in Defendants' motion for summary judgment," and it may
not be renewed.  *Id*.

Under the general mandate rule, "the mandate of an
appellate court forecloses the lower court from reconsidering
the matters determined above."  *Banco Nacional de Cuba v. Farr*,
243 F. Supp. 957, 970 (S.D.N.Y. 1965)(*citing United States v.
Haley*, 371 U.S. 18 (1962)(per curiam))(other citations omitted).

16

But although "a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues." *Sprague v. Ticonic Nat. Bank*, 307 U.S. 161, 168 (1939).

*Aleman v. Chugach Support Servs., Inc.*, 485 F.3d 206 (4th Cir. 2007), determined that Blasic could bring a retaliation claim[28] against the Defendants under § 1981.[29] *Id*. at 213-14. But it did not determine the merits of that claim or the Defendants' argument that the mixed-motive method of proof is unavailable under § 1981.[30] Thus, the Court will consider those matters.

---

[28] "Supreme Court and [Fourth] circuit precedent . . . hold retaliation to be a form of differential treatment subsumed in the antidiscrimination language of Section 1981." *Aleman*, 485 F.3d at 213.

[29] The Fourth Circuit found "no basis to conclude that ownership of the defendant corporations by Alaska Natives and their devisees, or any other attribute, entitles the defendants to immunity from suits" under Section 1981. *Aleman*, 485 F.3d at 213.

[30] "The defendants' similar argument that mixed-motive discrimination is not cognizable under Section 1981 does not appear to have been raised below and was not addressed by the district court. It cannot provide an alternate basis here for affirming summary judgment to the defendants on Blasic's claims." *Aleman*, 485 F.3d at 214 n.3.

2.    Blasic's Retaliation Claim

The *McDonnell Douglas* test is applicable to § 1981 retaliation claims.[31]  *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). Under that framework, Blasic must make a *prima facie* case of retaliation by showing (1) he engaged in a protected activity,[32] (2) his employer took an adverse employment action against him,[33] and (3) a causal connection between the protected activity and the adverse action.[34]  Here, the Court will assume, as the parties have, that Blasic has shown a *prima facie* case of retaliation.  Def.'s Mot. Summ. J. 28; Pl.'s Opp. & Cross Mot. 14.

3.    Non-Discriminatory Reasons for Blasic's
      Termination

The Defendants have the burden to show a legitimate, non-discriminatory reason for the adverse employment action.

---

[31]  *See McCray v. Pee Dee Reg'l Transp. Auth.*, 263 Fed. Appx. 301 (4th Cir. 2008); *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543 (4th Cir. 2003).

[32]  To show protected activity, Blasic need only show that he "opposed an unlawful employment practice which he reasonably believed had occurred or was occurring." *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003).

[33]  "Adverse employment actions include any retaliatory act or harassment if that act or harassment results in an adverse effect on the terms, conditions, or benefits of employment." *Honor*, 383 F.3d at 188.

[34]  *Honor v. Booz-Allen & Hamilton*, Inc., 383 F.3d 180, 188 (4th Cir. 2004)(*citing Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004)).

*Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007).  This burden is one of production and not persuasion. *Holland*, 487 F.3d at 214.  Here, the Defendants met that burden with Hutton's testimony that he fired Blasic for "insubordination and not being part of the team."  Def.'s Mot. Summ. J. Ex. 13 (James Hutton Dep. 139:13-16, Nov. 2, 2005).  They assert that Blasic's failure to follow the Company's procedures for making a discrimination complaint is evidence of his insubordination.  *Id*. at 10-11, 28-29.

        4.   Evidence of Pretext

     Blasic must prove that the Defendants' reasons "were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)(internal quote omitted).  He must show that the Defendants' proffered explanation "is unworthy of credence or . . . offer[] other forms of circumstantial evidence sufficiently probative of retaliation."  *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) (internal quotation marks and citations omitted).  "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  *Reeves,* 530 U.S. at 148.  Blasic has "the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination."

19

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Blasic argues that the Defendants' proffered reasons are pretextual because: (1) he was not insubordinate and properly reported the discrimination, (2) he was fired within a week after his discrimination complaint to Schreiber, and (3) the Defendants offered to rehire him soon after firing the personnel that he had complained about.  Pl.'s Opp. & Cross Mot. 21-24. Blasic has presented sufficient evidence for a reasonable jury to find that the Defendants' proffered reasons were a pretext for retaliation.

> a.   Insubordination and Failure to Follow Procedures

The Defendants argue that Blasic's failure to properly report the alleged discrimination and his conduct leading up to and during the October 22 meeting were "serious offenses" justifying his immediate termination without warning.  Blasic disagrees, arguing that the Defendants were not acting in accord with their progressive discipline policy when they fired him because he had not committed a "severe offense."

When an employer relies on its internal procedures to justify a termination decision, evidence that these procedures were violated may indicate pretext.  *See Plotke v. White*, 405 F.3d 1092, 1104 (10th Cir. 2005).  Blasic contends that his

dismissal violated the company policy of progressive discipline.
It is undisputed that the Defendants had a progressive
discipline policy.  Under that policy, employees could be fired
without a prior written warning only for "severe offenses."
Blasic had received no written warning before his termination.

Blasic did not follow the procedure for reporting
harassment when he emailed his concerns to Schreiber, who was
neither in human resources, his supervisor, nor an officer at
CSS.  But there is no evidence that these procedures were
mandatory and exclusive.  The Harassment Policy merely states
that employees "should" report incidents of harassment to
designated individuals.  Blasic has provided reasons for his
deviation from that policy.

Blasic's complaints were against his immediate supervisor,
Hamlett, the acting human resources manager for the NIH site.
Blasic also believed that Hutton, Hamlett's supervisor, was
"covering up" the discrimination.  Before his termination,
Blasic explained to Hutton that he directed his concerns to
Schreiber instead of human resources or an officer of CSS
because he had been instructed to keep her "in the loop."
Hutton was responsible for the decision to fire Blasic but never
mentioned Blasic's failure to follow harassment reporting

procedures as a reason for his termination.[35]  Thus, there are

questions of fact as to the seriousness of Blasic's failure to

follow the reporting procedures and the relevance of that

failure to the termination decision.

There are also questions of fact about Blasic's conduct

before and during his October 22 meeting with Hutton.  It is

undisputed that the relationship between Hamlett and Blasic was

strained[36] and he had a confrontational style that some co-

workers found difficult.[37]  But, until his termination, none of

Blasic's conduct had earned a written reprimand.[38]  On the

---

[35]  Hutton refers generally to Blasic's failure to follow
the "chain of command" but the Harassment policy was never
mentioned.  Blasic says that the Defendants changed their
explanation for his termination.  There is no evidence of
inconsistent explanations for Blasic's termination, as the
Defendants' assertion that Blasic failed to follow
discrimination reporting procedures is consistent with the
allegation that he was insubordinate and not a team player.

[36]  *See* Westermann Dep. 9:21-10:4.

[37]  *See, e.g.*, Brewer Dep. 66:14-18 ("[Blasic] was difficult
and antagonistic.  He wasn't a team player on the work site.  He
was accusatory before he found out all his facts.").

[38]  The list of Hamlett's oral reprimands of Blasic was not
created until October 27, 2003, days after Blasic was fired.
Blasic argues that this discipline log was "fabricated" because
it was created after he was terminated.  Pl.'s Opp. & Cross Mot.
21-22.  Although the document is properly dated and there is not
proof of fabricated evidence, it may be viewed as an after-the-
fact justification of the determination.  It is unclear how much
of this information Hutton knew when he decided to fire Blasic.

occasion when Blasic had faced discipline, Westermann tore up his reprimand and gave Blasic a "clean slate."[39]

On October 22, 2003, Blasic and Hutton met to discuss alleged racial discrimination at the NIH site.  Blasic accused Hutton of "covering up" what was going on at the NIH site and called Hamlett a "racist" and "bigot."[40]  Blasic said that Brabham could substantiate his allegations, but Hutton fired Blasic without meeting with Brabham.[41]  Hutton did not find Blasic's conduct sufficiently severe to warrant firing him on the spot.  But, upon reflection, Hutton "decided that Blasic never would get past his personal vindictive[ness] against Hamlett[] and should be terminated for the good of the project."[42]

On these facts, a reasonable jury could find that Blasic did not commit a "serious offense" by his conduct before or during the October 22 meeting because (1) Blasic had a disciplinary "clean slate," (2) Hutton failed to consider

---

[39]   Westermann Dep. 8:23.

[40]   Def.'s Mot. Summ. J. Ex. 44.

[41]   Defendants argue that Brabham and Hutton did meet and that "Brabham did not provide any information to support Blasic's allegation[s]."  Def.'s Reply & Opp. 26.  But, the Defendants do not specify when this meeting occurred, and the exhibit Defendants cite to support this allegation is not in the record.  *See id*. at Ex. 25.

[42]   Def.'s Mot. Summ. J. Ex. 44.

Brabham's substantiation and did not terminate Blasic
immediately for his conduct at the meeting, and (3) Blasic made
his remarks about Hamlett's racist attitude and Hutton's "cover
up" at a meeting to discuss discrimination.  The severity of
Blasic's conduct is also called into question by the Defendants'
offer to re-hire him shortly after his termination.  From this,
a reasonable jury might infer that Hutton was not acting
pursuant to the progressive discipline policy when he fired
Blasic.[43]  If the Defendants were not acting in accordance with
their internal policies when they fired Blasic, this may be
evidence of pretext.

b.   The Timing of Blasic's Firing

An adverse employment action closely following protected
activity may support an inference of pretext.[44]  Blasic was fired
one week after he sent the email to Schreiber, reporting alleged
discrimination, and on the day he met with Hutton to discuss
those concerns.  During the October 22 meeting, Blasic says that
Hutton "raised his voice after the subject of discrimination

---

[43]   The lack of required signatures on the "Personnel Action
Notice" terminating Blasic is also evidence of failure to follow
company policy.  *See* Pl.'s Opp. Damages Ex. 6.

[44]   In *Pulley v. KPMG Consulting, Inc.*, the Court held that
temporal proximity alone was not sufficient to show pretext.
348 F. Supp. 2d 388, 397 (D. Md. 2004).  But the time between
Blasic's complaint and his termination is one of several factors
to consider.

came up" and "became very angry."[45]  Within hours, Hutton had
fired Blasic for insubordination and poor teamwork.  A
reasonable jury could find that the timing of Blasic's
termination raises an inference that he was fired because of his
complaint.

c.   The Offer to Rehire Blasic

The offer to rehire Blasic, after the Defendants terminated
employees alleged to have discriminated, may be evidence of
discrimination.  *See Rizzo v. Sheahan*, 266 F.3d 705, 715 (7th
Cir. 2001)(employee may show pretext with evidence that the
explanation was not the "real" reason for the adverse employment
action).  Two months after Blasic was fired, Baehr called to
tell him that Hamlett and Hutton, the two men allegedly involved
in the discrimination, were no longer employed at the NIH site.[46]
Baehr then asked Blasic if he would be interested in returning
to CSS.  McCanna said that this offer was made in "an effort to
be fair" to Blasic.[47]  A reasonable jury may find that this offer
to reinstate Blasic implies that Hutton's stated reason for
terminating Blasic was a pretext for retaliation.

---

[45]   Blasic Dep. I 250:6-10.

[46]   *See* Blasic Dep I 19:17-18, 21:1-3.

[47]   McCanna Decl. Ex. 1 at 3.

25

    E.   Blasic's Renewed Cross-Motion for Partial Summary
         Judgment

    Blasic contends that he is entitled to summary judgment

under the mixed-motive framework "[b]ecause [the] Defendants

cannot prove that they would have terminated Blasic . . . had he

never voiced his objection to discriminatory conduct."  Pl.'s

Opp & Cross Mot. 55.  The Defendants argue that there are

genuine disputes of material fact that bar partial summary

judgment for Blasic.  Def.'s Opp & Reply 27.

         1.   The Mixed-Motive Framework in Section
              1981 Claims

    The Defendants assert that the mixed-motive framework is

limited to Title VII claims.  Def.'s Reply & Opp. at 5.  The

Fourth Circuit has applied the mixed-motive framework in non-

Title VII employment discrimination contexts.[48]  *Worden v.*

*Suntrust Banks, Inc.* approved "the equivalent of a mixed-motive

jury instruction in a claim under 42 U.S.C. § 1981."  549 F.3d

334, 342 (4th Cir. 2008)(*citing Williams v. Fermenta Animal*

---

    [48] *See Worden v. Suntrust Bank*, 549 F.3d 334, 342 (4th Cir.
2008)(Employment Polygraph Protection Act); *EEOC v. Warfield-
Rohr Casket Co.*, 364 F.3d 160, 164 n.2 (4th Cir. 2004)(Age
Discrimination in Employment Act); *Hill v. Michelin N. Am.,
Inc.*, 252 F.3d 307, 314-15 (4th Cir. 2001)(Uniformed Services
Employment and Reemployment Rights Act of 1994).  "Although
Congress amended only Title VII and not § 1981 . . . Courts have
analyzed [these] claims under the same framework since *Desert
Palace, Inc. v. Costa*, 539 U.S. 90, 123 (2003), even though the
mixed motive amendment was made to Title VII alone."  *Disher v.
Weaver*, 308 F. Supp. 2d 614, 622 n.4 (M.D.N.C. 2004).

*Health Co.*, 984 F.2d 261, 265 (8th Cir. 1993)).  The mixed-motive method of analysis is available in this § 1981 action.

### 2.   Mixed-Motive Retaliation Claim

A plaintiff may show discrimination with direct or circumstantial evidence that an impermissible factor motivated his termination.  42 U.S.C.A. § 2000e-2(m); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-02 (2003); *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005).  "[T]he impermissible factor need not have been the sole factor . . . [a]s long as it motivated the adverse action." *Diamond*, 416 F.3d at 318.  If retaliation was a factor motivating Blasic's termination, the Defendants are liable.  *Id*.  The Defendants have a limited affirmative defense if they "demonstrat[e] that [they] would have taken the same action in the absence of the impermissible motivating factor," i.e. if they can show a "mixed-motive" for their decision.  42 U.S.C. § 2000e-5(g)(2)(B).  A mixed-motive would not bar liability, but it would restrict Blasic's remedies to declaratory and injunctive relief, attorney's fees, and costs.  *Id*.

Here, there is no direct evidence that the Defendants fired Blasic for his discrimination complaints.  There is circumstantial evidence of retaliation.  *See* discussion *supra* Part II(D)(2).  Blasic is not entitled to summary judgment on his retaliation claim because there is a question of fact on the

pretext element of his circumstantial case.  *Id.*  If Blasic
proves retaliation under the *McDonnell Douglas* scheme, the
Defendants may limit their liability by introducing evidence
that they would have fired him without his discrimination
complaints.  Here, the Defendants have evidence that Blasic's
insubordination and poor teamwork were factors in the decision
to terminate him.  Thus, a reasonable jury may conclude that the
Defendants would have fired Blasic absent his discrimination
complaints.  Blasic's motion for summary judgment on his mixed-
motive claim will be denied.

    F.   Defendants' Supplemental Motion for Summary Judgment
        on Damages

Blasic claims damages from the Defendants' retaliation
including, back and front pay, emotional and reputational harms,
and punitives.  Am. Compl. ¶ VIII.  The Defendants assert that
Blasic has not shown that he is entitled to this relief.

      1.   Back and Front Pay

As finance manager at the NIH site, Blasic's salary was
$62,000, and he had fully funded health insurance, a 401k plan,
and paid vacation and sick leave.  Blasic Dep. I 90:14-91:16;
Blasic Interrogs. 2.  In his claim for back and front pay,
Blasic assumed that his salary at CSS would have increased by 3%
each year as a "cost-of-living increase . . . factored into the
cost" of government contract projects.  James M. Blasic Dep.

28

65:6-22, 66:12-14, Aug. 6, 2009 [hereinafter Blasic Dep II].
Blasic also approximated his benefits at CSS as 20% of his
salary.  *Id.* 67:7-68:19.  Based on these assumptions, Blasic
seeks $100,000 in back pay.  Blasic Interrogs. 5.

Back pay is generally available in a § 1981 employment
discrimination action.  *See Kornegay v. Burlington Indus., Inc.*,
803 F.2d 787, 788 (4th Cir. 1986).  Plaintiffs have a duty to
mitigate their damages, and back pay should be reduced by the
"[i]nterim earnings or amounts earnable with reasonable
diligence by the person . . . discriminated against."  42 U.S.C.
§2000e-5(g)(1).[49]  Front pay is "awarded for lost compensation
during the period between judgment and reinstatement or in lieu
of reinstatement."  *Pollard v. E.I. du Pont de Nemours & Co.*,
532 U.S. 843, 846 (2001).  Reinstatement is the preferred
remedy, but when it is infeasible or inappropriate, front pay
may substitute.  *See id.*[50]

---

[49]  "An injured party has a duty under both § 1981 and Title
VII to use reasonable diligence to attain substantially similar
employment and, thereby, mitigate damages."  *Deffenbaugh-
Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 591 (5th Cir.
1998).  The Fifth Circuit has recognized that no statutory duty
exists to mitigate damages under § 1981, but it is "guided by
the statutory duty to mitigate damages under § 2000e-5(g)" to
impose a similar duty in § 1981 cases.  *Patterson v. P.H.P.
Healthcare Corp.*, 90 F.3d 927, 935 (5th Cir. 1996).

[50] "In cases in which reinstatement is not viable because of
continuing hostility between the plaintiff and the employer or
its workers, or because of psychological injuries suffered by
the plaintiff as a result of the discrimination, courts have

Ordinarily, a plaintiff's rejection of an unconditional offer[51] to be rehired will toll the accrual of back pay liability and foreclose a claim for front pay. [52]   But "refusal of reinstatement does not necessarily preclude the award of front [or back] pay if a plaintiff has reasonably refused the offer." *Xiao-Yue Gu*, 127 F. Supp. 2d at 755.   Whether a reasonable person would have refused the offer is a question of fact.   *Id*.

Blasic argues that Baehr's January 20, 2004 voicemail offering him the "same position back at [his] old salary" was an insufficient offer of reinstatement because Baehr failed to put the details in writing.   Blasic Dep. I 18:16-19:2.   The Defendants bear the burden of proving that the offer of

---

ordered front pay as a substitute for reinstatement." *Pollard*, 532 U.S. at 846.

[51]   Contrary to the Defendants' argument, the accrual of back pay liability is tolled by the plaintiff's rejection not the Defendant's unconditional offer.   *See Ford Motor*, 458 U.S. at 219.

[52]   *See Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 228-33 (1982); *Xiao-Yue Gu v. Hughes STX Corp.*, 127 F. Supp. 2d 751, 755 (D. Md. 2001); *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 908 (2d Cir. 1997).   "The legal rules fashioned to implement Title VII should . . . encourage Title VII defendants promptly to make curative, unconditional job offers to Title VII claimants, thereby bringing defendants into 'voluntary compliance' and ending discrimination." *Ford Motor,* 458 U.S. at 228.   *Ford Motor* held that the rejection of "[a]n employer's unconditional offer of the job originally sought to an unemployed or underemployed claimant" tolled the accrual of back pay liability.   *Id*. at 232.   Although *Ford Motor* involved a failure to hire under Title VII, its principles are applicable here.

reinstatement was specific enough for Blasic to recognize that the job offered was comparable to his previous position. *Xiao-Yue Gu*, 127 F. Supp. 2d at 756.  Here, the Defendants met that burden because they offered to reinstate Blasic at his former salary within two months of his discharge.[53]

To avoid tolling the Defendants' payment obligations, Blasic must show that his refusal of their reinstatement offer was "reasonable."  Reasonableness is determined from the totality of the circumstances. *Smith v. World Ins. Co.*, 38 F.3d 1456, 1464 (8th Cir. 1994).  Factors showing a reasonable refusal include: (1) a long time between termination and the reinstatement offer, (2) refusal to expunge the employee's poor performance record, (3) continuing employment of the individuals responsible for the discrimination, (4) the employer's bad faith and overzealous attacks on the plaintiff's job performance, and (5) suspicious timing of the employer's offer. *See Xiao-Yue Gu*, 127 F. Supp. 2d at 755-56.  As a matter of law, "a commitment to a new employer does not preserve the employee's right to recover

---

[53] In *Xiao-Yue Gu*, an offer to give "Plaintiff her prior job with Defendant" was insufficient because it provided "no details as to salary, placement, title, or the type of anticipated work."  127 F. Supp. 2d at 757.  Here, Blasic was offered his "old salary" and "his old position."  This offer was specific enough to inform Blasic of his placement, title, and the work he would be doing.

back pay for discriminatory termination from a previous
employer."[54]  *Lightfoot*, 110 F.3d at 909.

        Blasic did not reasonably reject the offer for
reinstatement at CSS.  Baehr offered to reinstate Blasic within
two months of his termination, before the Defendants learned
that Blasic had filed an EEOC action.  Blasic had no written
reprimands at the time of his discharge; thus, there was no
record to expunge.  In a discussion on December 23, Baehr
informed Blasic that the two men who participated in the
discrimination and retaliation were no longer working at the NIH
site.  Nothing indicates that Baehr made the offer to reinstate
Blasic in bad faith or that the Defendants attacked Blasic's
performance after his termination.  No evidence demonstrating a
reasonable refusal is present here.

        There is uncontradicted evidence that Blasic's refusal of
reinstatement was unreasonable.  Blasic has testified that,
compared with his job at CSS, this new position "was a reduction
in responsibilities,"[55] "did not have any supervisory capacity,"[56]

---

[54]  If a plaintiff rejects an offer of reinstatement in
favor of remaining in a replacement job, the Court may assume
that "the value of the replacement job outweighs the value of
the defendant's job supplemented by the prospect of full court-
ordered compensation."  *Ford Motor*, 458 U.S. at 234-36.

[55]  Blasic Dep. I 89:14-15.

[56]  *Id*. at 89:20-21.

required him to work "longer hours,"[57] involved a "much longer

commute,"[58] and afforded him "less vacation, sick days, [and]

contribution . . . for health insurance."[59]  Blasic has stated

that he did not want the job at STG and began looking for other

employment immediately.[60]  Under these circumstances, a

reasonable person would have accepted the offer of reinstate-

ment.  As a matter of law, the Defendants' liability for back

and front pay ended when Blasic refused that offer.  *See Xiao-*

*Yue Gu*, 127 F. Supp. 2d at 755.

If Blasic prevails on his § 1981 claim, he is entitled to

back pay from his discharge to the date he rejected the

Defendants' offer of reinstatement.[61]  Any award of back pay may

include Blasic's increased expenses for his new position and be

reduced by what he earned while at STG.  Questions of fact

remain about the equivalence of Blasic's jobs at CSS and STG,

the value of his CSS benefits, and the date on which Blasic

[57]  *Id*. at 90:8.

[58]  *Id*. at 90:7-8.

[59]  *Id*. at 90:14-16.

[60]  Blasic Dep. I 92:8-22.

[61]  The Defendants challenge Blasic's assumptions that he
would have received a 3% annual salary increase and that his
benefits at CSS were valued at approximately 20% of his salary.
*See* Def.'s Supp'l Mot. Damages 15.  Because Blasic is not
entitled to front pay or back pay beyond the date when he
refused reinstatement, the Court need not address the
deficiencies of these estimates.

"rejected" the Defendants' offer to rehire him.  Because a

reasonable jury could find that Blasic is entitled to back pay,

summary judgment will be granted the Defendants on front pay and

denied on back pay.

    2. Emotional Distress & Related Compensatory Damages

  Blasic also claims damages for psychological and

reputational harms caused by his termination.  Pl.'s Opp.

Damages 9-12.  He has testified about "embarrassment [and]

humiliation" and damage to his professional reputation from

having to explain his discharge to recruiters, potential

employers, family, and friends.  Blasic Dep. I 69:11; 133:1-

134:20.  Blasic's termination was "degrading" and "disruptive to

[his] life" and caused him to lose his "self-esteem and

confidence."  Blasic Interrogs. 11.

  Blasic argues that he is entitled to compensatory damages

for "the embarrassment and humiliation, dislocation,

inconvenience, and damage to his resume all resulting as

consequences of being fired illegally by [the] Defendants."

Pl.'s Opp. Damages 10.  The Defendants argue that Blasic has not

provided adequate evidence to support these claims because he

relies on hearsay, his own testimony is vague, and he cannot

show that the alleged injuries were "caused by" the retaliation.

Def.'s Supp'l Mot. Damages 26-27.  Here, the sole evidence of

emotional distress is Blasic's testimony.

Although "a plaintiff's testimony, standing alone, may support a claim of emotional distress," the courts "scrupulously analyze" awards of compensatory damages in such cases. *Dennis*, 290 F.3d at 653 (4th Cir. 2002)(*quoting Price v. City of Charlotte*, 93 F.3d 1241, 1251 (4th Cir. 1996)).  "[T]he evidence of emotional distress must be demonstrable, genuine, and adequately explained." *Price*, 93 F.3d at 1252.  The plaintiff may not "resort to mere conclusory statements" but "must show a causal connection between the violation and [his] emotional distress." *Dennis*, 290 F.3d at 653 (internal quotations omitted).  This connection "must be between the distress and the violation itself, not the benefit denied."  *Id*.  These principles apply to Blasic's claim for reputational harms.[62]

Though Blasic explained his emotional and reputational injuries and described the reasons that he felt degraded and humiliated, he has provided no "demonstrable" evidence of distress or damage to his reputation.[63]  Further, the emotional

---

[62] *See Forshee v. Waterloo Industries, Inc.*, 178 F.3d 527, 531 (8th Cir. 1999)(applying the "genuine injury" test to awards of compensatory damages under Title VII).

[63] In *Bryant v. Aiken Regional Medical Centers, Inc.*, the Court awarded compensatory damages when Bryant testified to feeling "embarrassed, frustrated, and angry," "very disgusted," and that she "didn't feel good about coming into work."  333 F.3d 536, 546-47 (4th Cir. 2003).  But Bryant's case is distinguishable from Blasic's because Bryant also testified to "a series of specific physical ailments" including "frequent headaches, insomnia, irregular menstrual cycles, nausea, [and]

and reputational harms to which Blasic testified related to the loss of his job at CSS and not to the retaliation.  Thus, Blasic has not supported his claim for these compensatory damages and is not entitled to this relief.

        3.   Punitive Damages

Punitive damages under § 1981 require a showing that the Defendants acted with "malice" or "reckless indifference" to a federally protected right.  *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 441 (4th Cir. 2000)(*citing Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999)).  "[A]n employer may be held vicariously liable for a punitive damage award . . . for the intentionally discriminatory conduct of its employee, whe[n] the employee served the employer in a managerial capacity, committed the intentional discrimination at issue while acting in the scope of employment, and the employer did not engage in good-faith efforts to comply."  *Lowery*, 206 F.3d at 442.  For punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law."  *Kolstad*, 527 U.S. at 536.

Here, the Defendants do not contend that they were ignorant of the laws prohibiting retaliation against employees who

---

vomiting."  *Id.* at 547.  The Court also noted that Bryant was a medical professional "whose opinion as to her own condition the jury was entitled to consider."  *Id.* (internal quotations omitted).  Here, Blasic's conclusory statements are the only evidence of his emotional distress.

uncover workplace discrimination.[64]   Instead, they deny that

Hutton engaged in "intentional discrimination" against Blasic.[65]

Blasic argues that Hutton's intent to retaliate is shown by his

"open animosity," the proximity between Blasic's termination and

his discrimination complaints, and his failure to follow the

progressive discipline policy.[66]   Because Blasic has presented

evidence from which a reasonable jury could infer that Hutton

retaliated against him, the Defendants are not entitled to

summary judgment on the punitive damages claim.

III. Conclusion

       For the reasons stated above, Blasic's motion for partial

summary judgment and the Defendants' motion for summary judgment

---

[64]   The Defendants have produced evidence of their anti-
discrimination and harassment policies and training.  Def.'s
Mot. Summ. J. Ex. 23; McCanna Decl. Ex. 1 ("[D]iscrimination
training was conducted by our corporate trainer on October 21,
2003").  The Defendants' "Equal Opportunity Policy" states that
"CHUGACH will not retaliate or discriminate against any
individual because he or she has filed a charge of employment
discrimination or has testified, assisted or participated in an
investigation related to employment practices."  Def.'s Mot.
Summ. J. Ex. 23 at 90.

[65]   Giving all reasonable inferences to Blasic, there is
evidence that Hutton served in a managerial capacity and was
acting within the scope of his employment when he fired Blasic.

[66]   Blasic also argues that Hutton's intent to retaliate is
shown by the "fabricated evidence in the form of phony
discipline logs" for Blasic, inconsistent and shifting
explanations for Blasic's termination, and the lack of training
on civil rights for employees.  There is no evidence that his
discipline logs were "fabricated."  The notes and memorandum of
Hamlett's interactions with Blasic were not post-dated.  *See*
Pl.'s Opp. Damages Ex. 6 at 146, 152.

will be denied.  Blasic's motion to exclude Kost's report will

be granted as to his opinions on Blasic's termination and the

availability of accounting work in fall 2004 and denied as to

his opinion on the state of the Washington, D.C. area

construction market.  The Defendants' supplemental motion for

summary judgment on damages will be granted on front pay and

compensatory damages for emotional and reputational harms and

denied on back pay and punitive damages.


November 20, 2009 _____            _____/s/_____

Date                                         William D. Quarles, Jr.
                                             United States District Judge